Holden RUPERT, by his Mother and
Next Friend Andrea RUPERT,
Petitioner,

v.

SECRETARY OF THE DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 99–774V.

United States Court of Federal Claims.

Jan. 24, 2003.

Ronald C. Homer, Boston, MA, for peti-
tioner.

Michael P. Milmoe, Washington, DC, with
whom was Assistant Attorney General Rob-
ert D. McCallum, Jr., for respondent.

## OPINION

MILLER, Judge.

Before the court after argument is respondent's second motion for review of Special Master John F. Edwards's award of attorneys' fees and costs to petitioner. The special master set the hourly rates for counsel who prosecuted petitioner's claim under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1 to 300aa–34 (2000) (the "Vaccine Act"). Respondent sought review of the original award of attorneys' fees and paralegal fees. The United States Court of Federal Claims reviewed the special master's decision and remanded the case, with instructions to make an explicit finding of the prevailing market rate for a Vaccine Act or comparable attorney practicing in Boston, Massachusetts, as well as for a paralegal. If the special master were to determine that no such rate existed, the court instructed him to so find and, within the bounds of his discretion, to proceed to develop a reasonable rate. On remand the special master reviewed the original record, conducted an evidentiary hearing, and set new rates at which petitioner's attorneys and paralegals should be compensated. At issue on respondent's second motion for review is whether the rates upon which the attorneys' fees and the paralegal rate are based are arbitrary and capricious or contrary to law or an abuse of discretion.

## FACTS

On September 20, 1999, Andrea Rupert ("petitioner"), on behalf of her son Holden Rupert, filed a claim for compensation under the Vaccine Act. See Rupert v. Sec'y of HHS, No. 99–774V, 2002 WL 360005, at *1, 2002 U.S. Claims LEXIS 48, at *4 (Fed.Cl. Spec.Mstr. Feb. 14, 2002) ("Rupert I"). Petitioner voluntarily withdrew her case on October 30, 2000. See id. at *3, 2002 U.S. Claims LEXIS 48, at *8. Petitioner then sought an award of attorneys' fees and costs under the Vaccine Act's mandatory fee-shifting provisions, which confer on the special master discretion to award compensation to a claimant who files a petition in good faith and upon a reasonable basis, regardless of whether the petitioner prevails. See 42 U.S.C.

§ 300aa–15(e)(1); Martin v. Sec'y of HHS, 62 F.3d 1403, 1405 (Fed.Cir.1995). The special master awarded petitioner $11,687.50 in attorneys' fees, representing 14.50 hours of work by Kevin Conway, at $250.00 per hour; 15.00 hours by Ronald Homer, at $225.00 per hour; 62.50 hours of paralegal work at $75.00 per hour; and $2,160.00 in costs. See Rupert I at *11, 2002 U.S. Claims LEXIS 48, at *37–38. The special master awarded the attorney rates requested by petitioner and awarded a paralegal rate $10.00 less than that requested by petitioner. See Rupert I at *1, 2002 U.S. Claims LEXIS 48, at *1–2.

Respondent then sought review in the Court of Federal Claims of the special master's award of attorneys' fees and costs to petitioner. The record revealed that, in setting the market rate used in calculating petitioner's attorneys' fees, the special master apparently relied on the affidavit of one practitioner, Stephen I. Lipman, an attorney practicing personal injury law in Boston, Massachusetts, the same locale as petitioner's attorneys. However, the special master did not set forth a justification as to why this attorney's fees were representative of legal work of attorneys bringing claims under the Vaccine Act. See Rupert v. Sec'y of HHS, 52 Fed.Cl. 684, 693 (2002) ("Rupert II"). The court concluded that this omission constituted an abuse of discretion. See id. The court concluded that the special master had not made an explicit finding of the market rate in the client locale for attorneys making claims under the Vaccine Act. See id. at 689–90. The special master had found that the amounts requested by petitioner were not per se unreasonable, but nevertheless not inherently reasonable. See id. The court concluded that the basis for the special master's award of attorneys' fees was ambiguous and that a remand was warranted because the awarding court must articulate its reasons for the award or denial of fees. Id. at 690.

The court also concluded that the special master abused his discretion in awarding a $75.00 rate for petitioner's paralegals. See Rupert II at 693. Petitioner originally had requested compensation at a rate of $85.00. See id. The special master found that petitioner had failed to establish that rate as the

prevailing market rate for paralegals in Boston. The special master relied on another Vaccine Act decision that had awarded a $60.00 rate to paralegals in the Los Angeles area and extrapolated therefrom petitioner's paralegal fees at the rate of $75.00. *See id.* However, the special master provided no explanation for the applicability of the Los Angeles paralegal rate in the Vaccine Act case to paralegals in Boston, Massachusetts. The court concluded that the special master had abused his discretion in awarding paralegal fees without the requisite explanation as to how he arrived at that rate. *See id.* at 694.

The court therefore remanded the case to the special master to make an explicit finding of the prevailing market rate for a Vaccine Act or comparable attorney practicing in Boston, Massachusetts, as well as for a paralegal. *See Rupert II* at 694. If the special master could not make such a finding, the court directed the special master to so state and, within the bounds of his discretion, proceed to develop a reasonable rate. *See id.*

On remand the special master found that the prevailing market rates for medical malpractice, products liability, and personal injury work in Boston range from $105.00 an hour-for insurance defense in the far suburbs of Boston-to $365.00 an hour for an attorney practicing predominantly plaintiff's personal injury law in Boston. *See Rupert,* No. 99–774V, 2002 WL 31441211, at *2, 2002 U.S. Claims LEXIS 294, at *7–8 (Fed.Cl. Spec.Mstr. Aug. 26, 2002) (*"Rupert III"*). The special master found that the prevailing market rate for a Vaccine Act or comparable attorney in Boston of Mr. Conway's caliber ranges from $250.00 to over $365.00 an hour. The special master placed Mr. Conway within this range at $300.00 an hour. *See Rupert III* at *5, 2002 U.S. Claims LEXIS 294, at *19. The special master also found that the prevailing market rate for a Vaccine Act or comparable attorney in Boston of Mr. Homer's caliber ranges from $175.00 to $250.00 an hour. The special master placed Mr. Homer at the upper end of this range at $250.00 an hour. *See id.* at *5, 2002 U.S. Claims LEXIS 294, at *20. The special master established that the prevailing rates for a paralegal range from $45.00 an hour for a paralegal performing insurance defense work in the Boston suburbs to $100.00 an hour for a paralegal employed by a personal injury attorney in Boston. The special master awarded paralegal costs at a rate of $85.00 an hour. *See id.* at *2, *5, 2002 U.S. Claims LEXIS 294, at *8, *21. Originally, petitioner had requested $250.00 per hour for Mr. Conway, $225.00 for Mr. Homer, and $85.00 for paralegals. *See Rupert I* at *1, 2002 U.S. Claims LEXIS 48, at *1–2.

In arriving at the revised rates on remand, the special master reviewed the original record, *Rupert III* at *1, 2002 U.S. Claims LEXIS 294, at *6, which included affidavit evidence. He also requested further evidence regarding the range of prevailing market rates for Vaccine Act or comparable attorneys and paralegals in Boston. Petitioner and respondent both submitted supplemental affidavits. Petitioner submitted affidavits from W. Paul Needham, a Boston lawyer with 28 years' experience practicing both insurance defense and plaintiff's cases; and Arthur Licata, a Boston lawyer with 25 years' experience. Mr. Licata is a personal injury lawyer, and works on a contingency basis. Petitioner also submitted the affidavit of Stephen I. Lipman, a personal injury lawyer in Boston with more than 30 years' experience in civil and criminal matters, who also predominately works on a contingency basis. Petitioner submitted the affidavit of Brian O'Connell, a Wellesley, Massachusetts attorney with 15 years' experience. Mr. O'Connell has prosecuted a petition under the Vaccine Act. Finally, petitioner submitted the affidavit of Albert Zabin, a Boston-area attorney with 40 years' experience.

Respondent submitted affidavits from Thomas Lynch, a Boston attorney with 23 years' experience, 16 of which were in insurance defense; Owen McGowan, an outer-suburban Boston attorney with 15 years' experience practicing as both a plaintiff's attorney in personal injury cases and as insurance defense counsel; Patrick Pisano, a retired litigation manager for Chubb & Son, a major insurance company; and Barry J. Regan, Director of Claims and Risk Management for Eastern Dental Insurance Company. All of

the affiants, other than Mr. Zabin, testified before the special master over two sessions in August 2002. Two witnesses-one each for petitioner and respondent-testified telephonically.

The special master considered a number of different attributes of Vaccine Act claims to determine comparable practices. The special master characterized medical malpractice, products liability, and personal injury as practices comparable to practice under the Vaccine Act. The calculation of a prevailing rate was complicated by the fact that most medical malpractice, products liability, and personal injury attorneys work on a contingency basis, which is not easily convertible to an hourly rate as required by the Vaccine Act. *See Rupert III*, at \*4, 2002 U.S. Claims LEXIS 294, at \*16. The special master also considered the fact that attorneys practicing in the Boston suburbs bill their clients at lower rates than those in the city where counsel's office is located.

The special master rejected respondent's contention that insurance defense work is sufficiently comparable to a Vaccine Act practice to aid in setting attorneys' rates in the latter. The special master noted that attorneys employed by insurance companies generally charge lower rates than those charged by attorneys in private practice, because the relationship between the insurance company and the attorney eliminates the financial risk inherent to defense work. *See Rupert III* at \*2, 2002 U.S. Claims LEXIS 294, at \*9–10. The special master observed that, once an insurance carrier refers a case to an attorney, billable hours can be generated immediately. The special master therefore did not consider testimony regarding insurance defense work as appropriate or relevant in setting the attorneys' fee rates in this case.

Respondent challenges the hourly rates awarded to petitioner's attorneys by the special master in *Rupert III*. Respondent contends that the special master's findings were arbitrary and capricious, an abuse of discretion, and contrary to law. According to respondent, the evidence credited by the special master failed to support his finding of a prevailing market rate for either the attor-

neys or the paralegals. Respondent also argues that the special master abused his discretion in rejecting the prevailing market rates for lawyers retained by insurance companies who defend against medical malpractice, personal injury, and products liability claims.

## DISCUSSION

### 1. *Standard of review*

Congress specified three alternative courses of action available to the Court of Federal Claims in reviewing a special master's decision. The court can

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2). Although the Vaccine Act does not give guidance on what circumstances should give rise to fact-finding by the Court of Federal Claims, the legislative history of the Vaccine Act cautions that "the conferees have provided for a limited standard for appeal from the [special] master's decision and do not intend that this procedure be used frequently, but rather in those cases in which a truly arbitrary decision has been made." H.R.Rep. No. 101–386, at 517, *reprinted in* 1989 U.S.C.C.A.N. 3018, 3120.

The Federal Circuit has established that judges in the Court of Federal Claims, while acting within the bounds of the congressional mandate in 42 U.S.C. § 300aa–12(e)(2), should apply different standards of review, depending on what aspect of the special master's decision is on review:

These standards vary in application as well as degree of deference. Each standard applies to a different aspect of the judgment. Fact findings are reviewed by us,

as by the Claims Court judge, under the arbitrary and capricious standard; legal questions under the "not in accordance with law" standard; and discretionary rulings under the abuse of discretion standard.

*Saunders v. Sec'y of HHS*, 25 F.3d 1031, 1033 (Fed.Cir.1994) (quoting *Munn v. Sec'y of HHS*, 970 F.2d 863, 870 n. 10 (Fed.Cir. 1992)); *see also Turner v. Sec'y of HHS*, 268 F.3d 1334, 1337 (Fed.Cir.2001) (Federal Circuit reverses special master if its "fact findings are arbitrary and capricious, its legal conclusions are not in accordance with law, or its discretionary rulings are an abuse of discretion.") (citing *Munn*, 970 F.2d at 870 n. 10); *Flanagan v. Sec'y of HHS*, 48 Fed.Cl. 169, 173 (2000) (same, citing *Saunders*, 25 F.3d at 1033); *Grice v. Sec'y of HHS*, 36 Fed.Cl. 114, 117 (1996) (same, citing *Munn*, 970 F.2d at 870 n. 10); *Rooks v. Sec'y of HHS*, 35 Fed.Cl. 1, 4 (1996) (same, citing *Neher v. Sec'y of HHS*, 984 F.2d 1195, 1198 (Fed.Cir.1993)); *Cox v. Sec'y of HHS*, 30 Fed.Cl. 136, 142 (1993) (same, citing *Munn*, 970 F.2d at 870 n. 10); *Perreira v. Sec'y of HHS*, 27 Fed.Cl. 29, 32 (1992) (same, and expanding on § 12(e)(2)(B)), *aff'd*, 33 F.3d 1375, 1377 (Fed.Cir.1994).

The arbitrary and capricious standard of review is a narrow one. *See Carraggio v. Sec'y of HHS*, 38 Fed.Cl. 211, 217 (1997) (Court of Federal Claims "will not overturn a decision of the special master unless there was a clear error of judgment."); *Johnston v. Sec'y of HHS*, 22 Cl.Ct. 75, 76 (1990) (" 'To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' ") (quoting *Citizens to Preserve Overton Park, Inc., v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)); *see Lampe v. Sec'y of HHS*, 219 F.3d 1357, 1360 (Fed.Cir.2000) (citing *Munn* for proposition that arbitrary and capricious is most deferential standard); *Cucuras v. Sec'y of HHS*, 993 F.2d 1525, 1527 (Fed.Cir.1993) ("The Supreme Court discussed the arbitrary and capricious standard in terms of reliance on factors Congress placed beyond consideration, of failure to consider an important part of the Vaccine Act, of articulation of a decision running

counter to the evidence, or of implausibility beyond a difference of expert opinion."); *Bradley v. Sec'y of HHS*, 991 F.2d 1570, 1574 (Fed.Cir.1993) ("[T]he Claims Court judge reviews the special master's decision essentially for legal error or factual arbitrariness."); *Burns v. Sec'y of HHS*, 3 F.3d 415, 416 (Fed.Cir.1993) (defining arbitrary and capricious standard of review as " 'highly deferential.' ") (quoting *Hines v. Sec'y of HHS*, 940 F.2d 1518, 1528 (Fed.Cir.1991)). *See generally Overton Park*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (discussing at length arbitrary and capricious analysis).

The elaboration of the arbitrary and capricious standard by the Federal Circuit in *Hines*, 940 F.2d at 1527–28, a Vaccine Act case, sets forth the parameters of the court's review under this standard:

"[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (review of agency rulemaking); agency must articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made," *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207, 246 (1962) (review of agency adjudication); "proof that there was 'no reasonable basis' for the administrative decision will also suffice [to show arbitrary and capricious conduct], at least in many situations," *Prineville Sawmill Co., Inc. v. United States*, 859 F.2d 905, 913 (Fed.Cir.1988) (quoting *Keco Ind., Inc. v. United States*, 492 F.2d 1200, 1203–04, 203 Ct.Cl. 566 (1974)) (review of pre-award bid protest action against letting of government contract); reviewing court must "guard against an agency's drawing inferences that are 'arbitrary' in relation to the facts

found, no matter how substantial may be the support for those facts," *Midtec Paper Corp. v. United States,* 857 F.2d 1487, 1498 (D.C.Cir.1988) (review of agency adjudication); "the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision," *United States v. Garner,* 767 F.2d 104, 116 (5th Cir.1985); "whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions ...," *Mobil Oil Corp. v. Department of Energy,* 610 F.2d 796, 801 (Temp.Em.Ct.App.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (review of agency rulemaking) (quoting *Texaco, Inc. v. Federal Energy Admin.,* 531 F.2d 1071, 1076–77 (Temp.Em.Ct.App.1976)).

When applying the arbitrary and capricious standard, a reviewing court may not substitute its own judgment for that of the original trier of fact. *See Overton Park,* 401 U.S. at 416, 91 S.Ct. 814; *see also Lonergan v. Sec'y of HHS,* 27 Fed.Cl. 579, 580 (1993) (holding that reviewing court should accord deference to special master's decision, and "may not substitute its own judgment for that of the special master. . . .") (citing *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814; *Hyundai Elecs. Indus. Co. v. United States Int'l Trade Comm'n,* 899 F.2d 1204, 1209 (Fed.Cir.1990); *Gamalski v. Sec'y of HHS,* 21 Cl.Ct. 450, 452 (1990)); *Fadelalla v. United States,* 45 Fed.Cl. 196, 198 (1999).

"[T]he only time the Claims Court can make its own findings of fact is when that court, as a matter of law, has concluded that the special master was 'arbitrary and capricious.' " *Munn,* 970 F.2d at 870. While the Federal Circuit, on appellate review, consults only the record developed in the proceedings below, *Whitecotton v. Sec'y of HHS,* 81 F.3d 1099, 1105 (Fed.Cir.1996), the "Court of Federal Claims, on review of the special master's decision, can issue its own findings of fact," *id.* (comparing 42 U.S.C. §§ 300aa–12(e) and 300aa–12(f)).

Respondent seeks review of the special master's decision, arguing that the certain of

the special master's factual findings were arbitrary and capricious or otherwise contrary to law. Respondent also argues that the special master abused his discretion in failing to consider the prevailing market rates for medical malpractice, personal injury, and products liability defense lawyers. These are questions of law subject to *de novo* review. *See Munn,* 970 F.2d at 870 n. 10.

The Vaccine Act allows recovery of "reasonable attorneys' fees, and other costs." 42 U.S.C. §§ 300aa–15(e)(1)(A), (B). The court uses the "lodestar" method for determining the reasonable fee to be awarded. *See Rupert II* at 686 (citing cases). As this court discussed in *Rupert II,* the lodestar method is a two-step process. *See Hensley v. Eckerhart,* 461 U.S. 424, 433–34, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). First, the court determines the lodestar, an initial estimate of reasonable attorneys' fees. *See id.* at 433, 103 S.Ct. 1933. The lodestar is calculated by determining the prevailing market rate, which is the rate "prevailing in the community for similar services." *Blum v. Stenson,* 465 U.S. 886, 895–96 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). This lodestar is presumed to be the reasonable fee to which the applicant's attorney is entitled. *See id.* at 897, 104 S.Ct. 1541. The burden is on the fee applicant to establish the lodestar. *See id.* at 895–96 n. 11, 104 S.Ct. 1541. Second, the court may adjust the lodestar rate upward or downward to keep the fee in line with the nature of the services rendered in the particular case. *See Hensley,* 461 U.S. at 434, 103 S.Ct. 1933. Because the lodestar is presumed reasonable, adjustments are the exception rather than the rule. *See Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). A fuller explication of the lodestar analysis appears in *Rupert II.* *See generally Rupert II* at 686–87.

2. *Analysis of prevailing market rate by special master*

With respect to attorneys practicing medical malpractice, personal injury, and products liability cases, *Rupert III* at *2, 2002 U.S. Claims LEXIS 294, at *8, the special master found that these attorneys "work usually on

a contingent basis," rather than billing at an hourly rate. *Id.* at *4, 2002 U.S. Claims LEXIS 294, at *16. Respondent notes that all but one witness—Mr. Lipman—stated that he works exclusively on a contingent-fee basis when representing plaintiffs in these types of cases. The special master found that Mr. Lipman had charged an hourly rate in one case, and that " 'more recently' he has begun to represent 'some cases on an hourly basis' " in the personal injury field. *Rupert III* at *4, 2002 U.S. Claims LEXIS 294, at *17 (quoting Transcript of Proceedings, *Rupert v. Sec'y of HHS,* No. 99–774V, at 212 (Fed.Cl.Spec.Mstr. Aug. 7, 16, 2002) ("Tr.I")). Respondent contends that, because Mr. Lipman rarely charges hourly rates for his personal injury matters, his testimony does not constitute "sufficient, reliable evidence of a 'prevailing' market rate for those services." Resp.'s Br. filed Sept. 25, 2002, at 8. Petitioner responds that the special master did not rely solely on Mr. Lipman in setting the relevant prevailing rates for attorneys and paralegals in Boston, but, rather, relied on all the submitted affidavits and the record as a whole.

The special master's decision reflects that he did not rely solely on Mr. Lipman's testimony in setting the prevailing rate. The special master stated that he reviewed all the affidavits submitted by the parties, as well as the record as a whole, in setting the relevant prevailing rates for attorneys and paralegals in Boston. *See Rupert III* at *1, 2002 U.S. Claims LEXIS 294, at *6–7. The special master conducted a hearing on remand and received the testimony of eight witnesses familiar with attorneys' rates in Boston and the surrounding areas. *See id.* at *1, 2002 U.S. Claims LEXIS 294, at *7.[1] He also specifically cited testimony by Mr. O'Connell, indicating that he had sought $200.00 an hour for a Vaccine Act case that he handled, *id.* at *4, *5, 2002 U.S. Claims LEXIS 294, at *17, *20, which the special master regarded as a self-discounted rate, *see id.* at *6, 2002 U.S. Claims LEXIS 294, at *28. The special master relied on this testimony and the record to establish the range of rates that exists for

attorneys and paralegals who provide services comparable to Vaccine Act attorneys both in Boston and the surrounding suburbs.

Respondent argues in the alternative that the special master erred in relying on hourly rates charged by Boston attorneys for other complex civil matters. The special master's finding of the appropriate rate range for Mr. Conway is based upon the testimony of Messrs. Needham, Licata, and Lipman; and the rate range for Mr. Homer is based upon the testimony of Messrs. McGowan and O'Connell. *See Rupert III* at *4, 2002 U.S. Claims LEXIS 294, at *18. These witnesses testified that they typically do not charge an hourly rate for their plaintiff's work in the relevant legal fields, but that they do charge an hourly rate for other civil matters, such as civil rights, commercial litigation, shareholder derivative actions, and for providing the service of "good counsel." Resp.'s Br. filed Sept. 25, 2002, at 8. The special master used these fee rates when setting the prevailing market rate for the attorneys in the case at bar. Although the special master found that personal injury, medical malpractice, and products liability are comparable fields to litigation under the Vaccine Act, the special master looked outside those fields when setting the prevailing rate, acknowledging that attorneys in the comparable fields primarily work on a contingency basis. This renders the special master's inquiry flawed, in respondent's view, because the special master failed to establish the manner in which complex litigation is comparable to the services provided by an attorney in a Vaccine Act case.

Petitioner responds by citing cases that refer to Vaccine Act litigation as complex, *Monteverdi v. Sec'y of HHS,* 19 Cl.Ct. 409, 434 (1990), and which state that the Vaccine Act itself is complex legislation, *Amendola v. Sec'y of HHS,* 989 F.2d 1180, 1182 (Fed.Cir. 1993).

The special master made a factual determination on remand that the record contained ample evidence to enable him to establish

---

1. Mr. Lipman's hourly rate was the special master's point of departure for developing the lodestar.

comparable rates for attorneys practicing in Boston, Massachusetts. *See Rupert III* at *3–4, 2002 U.S. Claims LEXIS 294, at *11–17. The court must give great deference to the special master's finding in this respect. *See Cucuras,* 993 F.2d at 1527 (arbitrary and capricious standard applies to review of factual determinations). However, respondent is correct that the special master did not identify the specific types of legal corollaries or compare them with the legal work required in Vaccine Act cases. The record on review, however, supports a finding that certain types of civil matters are comparable to Vaccine Act practice.

As this court reiterated in *Rupert II*, the issue of whether practice under the Vaccine Act is comparable to other complex litigation is a "factual determination." *Rupert II* at 691 n. 7. The special master made a finding that other types of civil matters provide appropriate benchmarks for establishing a lodestar in this case. *See Rupert III* at *4, 2002 U.S. Claims LEXIS 294, at *16–17. "[T]he rates charged in private representations may afford relevant comparisons" for setting lodestar figures under fee-shifting statutes. *Blum,* 465 U.S. at 895–96 n. 11, 104 S.Ct. 1541. Moreover, the Federal Circuit and the Court of Federal Claims disagree with the proposition that Vaccine Act litigation is not comparable to complex litigation. *See Thorne–Erickson v. Sec'y of HHS,* No. 96–361V, 1999 WL 1268149, at *4, 1999 U.S. Claims LEXIS 292, at *19–20 & n. 8 (Fed.Cl. Spec.Mstr. Dec. 10, 1999).

Respondent also questions the special master's consideration of rates for other types of civil matters, characterizing the special master's expressed grounds for including such rates as reflective not of the prevailing market rate, but of how attorneys performing this kind of work "valued their time." Resp.'s Br. filed Sept. 25, 2002, at 10. Under a lodestar analysis, respondent argues, the finder of fact should not try to establish a just or fair price for legal services, but "the *market* price for legal services." *Id.* at 10 (quoting *Pressley v. Haeger,* 977 F.2d 295, 299 (7th Cir.1992)).

Respondent is mistaken that the special master took Messrs. O'Connell and McGow-

an's rates into account merely because they represent how each attorney values his time. Respondent quotes the special master out of context. The special master noted that, while the rates do represent "how each attorney values his time," they are also "a reflection of rates that the market will bear" and are therefore "appropriate and relevant to the sole issue in this case: the prevailing market rate in Boston, Massachusetts." *Rupert III* at *4, 2002 U.S. Claims LEXIS 294, at *17. The special master's use of Messrs. O'Connell and McGowan's rates in setting the prevailing rate in this case was proper under the standard respondent cites. *See Pressley,* 977 F.2d at 299.

Respondent contends that the special master abused his discretion in failing to consider the prevailing market rates for lawyers who defend insurance carriers against medical malpractice, personal injury, and products liability claims. The special master deemed an analogy between insurance defense work and Vaccine Act litigation "grossly absurd." *Rupert III* at *2, 2002 U.S. Claims LEXIS 294, at *9. Respondent argues that the special master erred in finding that only hourly rates charged by the plaintiff's bar should be considered in determining the prevailing market rate under the lodestar analysis.

Petitioner responds unconvincingly that the special master did not disregard completely evidence of insurance defense lawyers' rates. After describing the insurance model analogy as grossly absurd, the special master stated that "the rates applicable to the submarket of insurance defense attorneys in Boston, Massachusetts, do not assist him in identifying the range of prevailing market rates for a Vaccine Act or comparable attorney in Boston, Massachusetts." *Rupert III* at *4, 2002 U.S. Claims LEXIS 294, at *17–18. Further, when establishing the parameters of attorneys' rates, the special master did not include the estimates proffered by Messrs. Lynch, Regan, or Pisano. Mr. Lynch has 23 years' experience and testified that attorneys at his level in the insurance defense field earn between $135.00 and $150.00 an hour. *See* Tr. I at 315. Mr. Regan testified that partners in the insurance defense field charge between $140.00

and $155.00; associates between $120.00 and $140.00; and paralegals between $55.00–$65.00. *See* Tr. I at 266. Mr. Pisano testified that insurance defense attorneys at the partner level charge between $135.00 and $150.00; associates between $110.00 and $140.00; and paralegals between $70.00 and $75.00. *See* Tr. I at 284. Before setting the fee rates for Messrs. Conway and Homer and the paralegals, the special master established the following parameters for each rate: $250.00 to $365.00, $175.00 to $300.00, and $80.00 to $100.00, respectively. *See Rupert III* at *5, 2002 U.S. Claims LEXIS 294, at *19–21. Those parameters did not include the lower ranges proffered by respondent through the testimony of Messrs. Lynch, Regan, and Pisano.

Respondent further contends that insurance defense provides a valid analogue to Vaccine Act practice because the market influences how defense attorney rates are set, which is a missing element in contingency-based personal injury, products liability, and medical malpractice work. Because the rates for insurance defense reflect the market for services relating to the same questions of fact, they should be applied to the Vaccine Act lawyers in this case. Respondent cites the special master's statement that insurance defense attorneys' rates are "market-driven" and "negotiated" with the law firms "in arms-length deals." *Rupert III* at *2, 2002 U.S. Claims LEXIS 294, at *9. Respondent's logic is flawed on this count. The fact that insurance defense attorneys negotiate their rates at arm's length with insurance companies reflects the contract-based market rate. Although market elements inhere in their relationship, insurance companies and defense lawyers nevertheless sign fixed contracts and therefore do not operate on the same basis as the attorneys who bring Vaccine Act cases. The contractual nature of the relationship between insurance defense attorneys and insurance compa-

nies tends to lower the rates paid to the former. A similar corollary is lacking in the Vaccine Act context. The negotiation that takes place therefore would not support a finding that the rates insurance companies pay defense lawyers represent a purely market-driven rate for those services. Respondent has failed to show that insurance defense is an appropriate analogue to Vaccine Act practice.

### 1) *Risk*

 Respondent argues that the special master erred as a matter of law in setting a market rate for the attorneys in this case that included compensation for services rendered on cases that were not filed, *i.e.*, for risk of nonpayment. The risk of nonpayment, or contingency, is not an appropriate consideration in setting the lodestar rate under fee-shifting statutes. *See City of Burlington v. Dague*, 505 U.S. 557, 562–63, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992).[2] The special master acted contrary to statute and precedent when he considered the existence of such risk. *See Rupert III* at *3, 2002 U.S. Claims LEXIS 294, at *11 (stating that there is inherent risk of nonpayment when Vaccine Act claims are found to have been brought in bad faith or lacking reasonable basis).

The special master posed the same questions to three of petitioner's four attorney witnesses. He asked Messrs. Needham, Licata, and O'Connell whether their rates reflected the risk that they would not recover for every case they reviewed. The following hypothetical is representative of the questions that the special master asked these witnesses directly:

THE COURT: Now, let me ask you a hypothetical. If you bill to practice upon representing claimants in fee shifting programs, and you were virtually guaranteed a reasonable fee for those cases that you brought that had a reasonable and good

---

**2.** The Supreme Court in *Dague* held that a court determining an award of reasonable attorneys' fees under fee-shifting statutes cannot "enhance" the fee award above the lodestar amount to reflect that the attorney was retained on a contingent fee basis. While the *Dague* court did not speak directly to the question of time spent on cases not filed, it suggests that the prohibition of

including contingency of nonpayment as a basis for enhancing a lodestar fee also requires rejection of the contingency of nonpayment as a factor in setting a lodestar rate. The Ninth Circuit in *Davis v. City & County of San Francisco*, 976 F.2d 1536, 1549 (9th Cir.1992), treats *Dague* as an "outright rejection" of contingency as a factor to be considered in setting a lodestar.

faith basis, but you had to do some solicitation to attract cases, and you had to review cases, and you couldn't file every case that came through your door to receive a fee at the end, would you be able to sustain a practice based upon insurance defense rates that are reflected in the affidavits that respondent has filed?

Tr. I at 124; *see also* Tr. I at 77 (Needham), 122 (Licata),[3] 196 (O'Connell). The special master concluded: "Just as the insurance defense attorney's rate reflects the absence of risk, the Vaccine Act attorney's rate must reflect the presence of risk." *Id.* at 12. This consideration was in error. As this court established in its first review of the special master's initial decision, "the accounting for risk [ ] is not a consideration in litigation brought under statutes with mandatory fee-shifting provisions, such as the Vaccine Act." *Rupert II* at 686–87 n. 2.

■ Another subject is troubling to the court, although not a basis for its findings on review. Counsel for petitioner, Mr. Conway, took the position that, in the context of the Vaccine Act, fees are "overhead" because they are not subject to immediate reimbursement. *See* Tr. I at 36. Mr. Needham emphasized the recovery of "overhead," which he described, *inter alia,* as fronting the cost of experts until the conclusion of the proceeding. According to Mr. Needham, this type of overhead is one of the factors that a Vaccine Act petitioner's counsel uniquely must sustain. *See* Tr. I at 36–38, 60.

Timing of payment in general was also important to Mr. O'Connell, who was petitioner's counsel in a Vaccine Act case that included an appeal and was resolved only after five years. *See* Tr. I at 150. Although the special master rejected petitioner's argument based on delayed payment of witness fees, Tr. I at 329, questioning on the subject was permitted during the first day of the hearing when petitioner's witnesses testified, and this factor was central especially to the testimony of Messrs. Needham and O'Con-

nell; indeed, the subject comprised much of their testimony. The special master's decision does not consider delay in payment as a factor, but excising delay from the testimony does not leave much evidence to sustain his findings.

■ "The special master decline[d] to reduce either Mr. Conway's rate or Mr. Homer's rate based upon a perception that 'litigation under the Vaccine Act does not compare to the kind of "skill, experience, and reputation" required of those attorneys who can command the highest market rates.'" *Rupert III* at *5, 2002 U.S. Claims LEXIS 294, at *20 n. 8 (quoting *Rupert II* at 691 (citing *Morris v. Sec'y of HHS,* 20 Cl.Ct. 14, 30 (1990); *Zeagler v. Sec'y of HHS,* 19 Cl.Ct. 151, 153–54 (1989))). In *Rupert II* the court did not instruct the special master to factor this perception into account, but, rather, cited cases that had done so. On remand, the special master adjusted the rate down, reducing attorneys' fees based on the number of hours billed for a given task. *Rupert III* at *5, 2002 U.S. Claims LEXIS 294, at *20 n. 8 ("Nevertheless, the lodestar includes a component that considers the skill necessary to prosecute a case: the concept of a reasonable number of hours."). This was error. The Supreme Court in *Blum* endorsed a similar rationale to adjust for novelty and complexity of issues once the reasonable rate had been established. *See Blum,* 465 U.S. at 898–99, 104 S.Ct. 1541. Absent in this case is the predicate to that adjustment—the reasonable rate. In discussing the appropriateness of an addition to the reasonable rate, the Supreme Court stated:

> There may be cases, of course, where the experience and special skill of the attorney will require the expenditure of fewer hours than counsel normally would be expected to spend on a particularly novel or complex issue. In those cases, the special skill and experience of counsel should be reflected in the reasonableness of the hourly rates.

---

**3.** The special master queried Mr. Licata as follows:

THE COURT: Would you agree with me, Mr. Licata, that there is an element of risk to a plaintiff's practice where not every client who

walks in the door represents a fee versus relative no risk in the defense, insurance defense practice; does that make sense?
Tr. I at 125.

*Id.* at 898, 104 S.Ct. 1541. These factors should not have been considered in determining the hourly rate; the number of hours billed for a given task can be adjusted once that rate is established.

### 3. *Record review*

The court accords due deference to a special master's findings insofar as he has specialized knowledge of the Vaccine Act and the medical issues that arise thereunder. *See Hodges v. Sec'y of HHS,* 9 F.3d 958, 961 (Fed.Cir.1993) (noting special masters' "accumulated expertise" in field of Vaccine Act cases); *Sword v. US,* 44 Fed. Cl. 183, 188 (1999) (discussing "unique ability" of special masters due to specialized knowledge in Vaccine Act cases). The special master grounded his findings on the two-day hearing. In addition, he relied on the record developed in *Rupert I,* his own background, and 12 years' experience in adjudicating disputed claims under the Vaccine Act. The record does not support his findings.

Although it is a question of law, the court's ruling that the special master erred in according great weight to the factor of risk of nonpayment is the product of a record review, as is the legal ruling that adjusting fees for hours worked is not part of the lodestar determination. This review also is the predicate for the court's conclusion that the rates for the legal services are arbitrary and capricious and that those rates therefore must be set aside. Having concluded that the special master's findings are arbitrary and capricious, this court endeavors to make its own findings of fact. *See Whitecotton,* 81 F.3d at 1105 ("Court of Federal Claims, on review of the special master's decision, can issue its own findings of fact."); *Munn,* 970 F.2d at 870 ("[T]he only time the Claims Court can make its own findings of fact is when that court, as a matter of law, has concluded that the special master was 'arbitrary and capricious.'"). The evidence supporting the rates that the court sets is drawn from the record on review.

The court has reviewed all the testimony of the witnesses elicited from petitioner's and respondent's counsel. Risk is a dominant concern in all of their testimony. However, risk is an improper consideration in the lodestar analysis. Because the witnesses placed such an emphasis on risk in testifying to rates from which Vaccine Act rates can be extrapolated, the court must view conservatively the rates that the witnesses sponsor.

■ Setting higher rates for both attorneys than those requested by petitioner was also arbitrary and capricious. First, the special master does not state what factors informed his selection of the appropriate rate from within the range of rates that he established. He also failed to consider the fact that practice under the Vaccine Act is streamlined: It lacks a complex motions practice, and proof of causation in Vaccine Act cases is not always required if the injury is a Table injury.[4] Absent from the record is any correlation of practice under the Vaccine Act with complex commercial practice.

### 4. *Findings of fact*

The court observes that the special master made credibility findings in his decision, as well as from the bench. His decision states: "In the special master's view, Mr. McGowan's and Mr. Lynch's attestations ring hollow," *Rupert III* at *3, 2002 U.S. Claims LEXIS 294, at *13, so instead he based his findings on the "persuasive, wholly believable, sworn testimony," *id.* at *5, 2002 U.S. Claims LEXIS 294, at *19, of Messrs. Needham, Licata and Lipman, as well as that of Messrs. O'Connell and McGowan, despite, apparently, the latter's alleged "hollow" attestations that he would take a Vaccine Act case at rates similar to those received from his insurance clients. *Id.* *3, 2002 U.S. Claims LEXIS 294, at *13. At the conclusion of testimony, the special master stated that he found Mr. Lipman to be "exceedingly interesting and persuasive." Tr. I at 357. Credibility is the purview of the special master, and the court's findings do not detract from his assessments.

The testimony of Messrs. Lipman, Licata, O'Connell, and McGowan supports a finding that a prevailing market rate can be ascertained based on a range of rates reflective of

---

4. *See* 42 U.S.C. § 300aa–14 (defining Table injury).

practice in Boston. The court now sets the reasonable rates for the petitioners' attorneys and paralegals in this case.

Petitioner's witnesses were familiar with the background of the underlying case, the affidavits, the Vaccine Act, some case law, and the legal skills required in Vaccine Act practice. Three witnesses could correlate the work, in a general sense, with comparable work in the private sector, and Mr. O'Connell had first-hand experience with a Vaccine Act case.

### 1) *Insurance model*

■ The court's own review of the record confirms that respondent failed to mount an adequate case for including in the lodestar analysis rates paid to defense attorneys in the personal injury, products liability, and medical malpractice fields. The special master might have been extravagant in describing the insurance model as "grossly absurd," *Rupert III* at \*2, 2002 U.S. Claims LEXIS 294, at \*9; *see also* Tr. I at 356, and "utterly ridiculous," Tr. I at 356, and pointed out his "vehement disagreement" with the model, Tr. I at 361, but, as the special master stated, respondent's witnesses did not "appreciate the intricacies of representing an individual client [under] the [Vaccine Act]." *Rupert III* at \*3, 2002 U.S. Claims LEXIS 294, at \*14. Prior to the hearing, each of respondent's three witnesses had reviewed a copy of the Guidelines for Practice Under the National Vaccine Injury Compensation Program, which is issued by the Office of Special Masters, and had reread his own affidavit and/or had spoken with respondent's counsel. None of these witnesses had read an opinion involving a Vaccine Act case. In fact, none of respondent's witnesses had read the Vaccine Act. Consequently, none could evaluate personal injury, products liability, and medical malpractice insurance defense work against the requirements of Vaccine Act practice. Respondent may have had grounds to argue that aspects of the insurance model are more similar to those in Vaccine Act practice than are complex commercial matters, but respon-

dent did not make its case on the record before the special master.

Petitioner's witnesses identified significant dissimilarities in Vaccine Act practice and insurance defense work. They had practiced either as insurance defense counsel or were familiar with insurance defense work in the personal injury, medical malpractice, and products liability fields. They testified to sufficient attributes of the insurance model that support a finding that insurance defense work may be as challenging as Vaccine Act cases at times, but it is not as demanding in several important aspects.

For example, the witnesses discussed the need for Vaccine Act attorneys to appeal questions of statutory interpretation and complex causation issues. In contrast, appeals taken from cases lost by insurance counsel at the trial level typically are sent to appellate attorneys who charge higher rates. These appellate attorneys are compensated at a level which greatly exceeds the $175.00 [5] per hour that insurance defense attorneys are compensated for cases at trial. Although respondent makes much of the fact that discovery under the Vaccine Act is abbreviated and that litigation under the Act lacks a significant dispositive motions practice, the record contains a persuasive riposte to the contentions that private sector attorneys have jury trials (bench trials can be more difficult, especially when they involve complex medical evidence) and that Vaccine Act hearings do not use rules of evidence (the special master controlled the admissibility of evidence, although testimony in response to leading questions predominated).

The record supports a finding that the most comparable practice to Vaccine Act work is complex civil matters, not plaintiff's personal injury, medical malpractice, and personal liability work. As petitioner's witnesses testified, the latter practices are conducted largely on a contingency fee basis (with the exception of 5% of Mr. Lipman's personal injury cases). However, these fields, according to petitioner's witnesses, require the same legal acumen as Vaccine Act

---

**5.** $175.00 is the lower end of the rate range to which Mr. McGowan testified for insurance de-

fense attorneys.

cases; the witnesses themselves practice in dual areas (complex civil matters, as well as plaintiff's personal injury work). The witnesses detailed their backgrounds and experience and the types of representations in which they engaged. This testimony substantiates a correlation of the skills required in complex civil matters and Vaccine Act cases.

### 2) *Prevailing market rate*

The testimony of Messrs. Lipman and Licata is sufficient to establish a lodestar for Mr. Conway, because they have comparable skills to that of Mr. Conway. *See Rupert III* at *4, 2002 U.S. Claims LEXIS, at *18. Similarly, the record supports the use of Messrs. O'Connell and McGowan to set a lodestar for Mr. Homer. *See id.*

Mr. Lipman's testimony served as the predicate for the higher rates awarded on remand, which respondent challenges. Of all petitioner's witnesses, Mr. Lipman displayed the least familiarity with Vaccine Act legal work;[6] however, he had high regard for Mr. Conway's reputation, and the court, of course, does not question the considerable weight that the special master attached to reputation in the legal community. *See* Tr. I at 361. Mr. Lipman testified that over the past three years he had charged an hourly rate of $365.00 plus a 6% general and administrative fee in 5% of his plaintiff's personal injury work; he is retained on a contingency basis in the other 95% of such work. *See* Tr. I at 223. This was the highest specific comparable rate mentioned by petitioner's witnesses and informs the court's analysis because it represents plaintiff's personal injury work billed at an hourly rate rather than on a contingency basis. However, Mr. Lipman did not attach that rate to Mr. Conway's experience; this testimony relates only to the rate he himself charges clients. Mr. Lipman himself put Mr. Conway in a different category, *i.e.*, less experienced and therefore commanding a lesser rate, Tr. I at 218, although he estimated a general rate for an attorney of Mr. Conway's specialized experience at somewhere in the range of $250.00 to $400.00 an hour. *See id.* Because Mr. Lipman is not a proxy for Mr. Conway, the record cannot support an upper limit of $365.00 or higher on the basis of Mr. Lipman's testimony alone, *Rupert III* at *5, 2002 U.S. Claims LEXIS 294, at *19, for the prevailing rate.

Mr. Needham's testimony proves unhelpful as he did not provide the court with sufficient support for his estimates of the applicable prevailing rate. Counsel for respondent questioned him, as follows:

Q I think you testified earlier today, in response to one of Mr. Conway's questions, that the, from your understanding, the prevailing market rate for Boston lawyers is between $250 and $450; did I understand that correctly?

A Yeah. Maybe, maybe $225, $475; $250, $450. It's kind of hard. I mean, there are lawyers in Boston that charge $500 and $600 an hour. I mean, I think that's, I think some of that's foolishness, and I think it's just a ploy so that you'll be delighted to take their associate at $300 an hour, but I have been involved in cases with legal rates, people that are going to be compensated as high as $475, and I think the absolute low end is $250, $225.

Tr. I at 83. Mr. Needham's testimony is so erratic-suggesting a range from $225.00 to $600.00–that it provides minimal guidance to the court's inquiry. The court cannot go so far as to credit Mr. Needham's testimony by establishing the upper limit of Mr. Conway's rate at $600.00, or even $450.00.

In addition to Mr. Lipman, Mr. Licata provided meaningful testimony that aids the court in setting an upper limit for Mr. Conway's rate. Mr. Licata testified that his rate for civil matters is $350.00 to $375.00 an hour. *See* Tr. I at 89. Based on the reasonable lower limit provided by Mr. Lipman's

---

6. For example, Mr. Lipman emphasized that *Daubert* hearings, *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (holding that Federal Rules of Evidence require trial courts to hold hearings-referred *to as Daubert* hearings-to determine reliability of scientific expert testimony before admission at trial), are conducted "routinely" and are "de rigueur," Tr. I at 216, in cases tried before special masters. This statement is not accurate.

testimony and the reasonable upper limit established by Mr. Licata, the record supports a range of $250.00 to $375.00 for Mr. Conway.

With respect to Mr. Homer, Mr. O'Connell testified that he generally charges $200.00 to $250.00 for commercial matters and charged $200.00 in the one Vaccine Act case that he handled to completion in 2000. *See* Tr. I at 140, 145–46, 150. Mr. McGowan testified that he charges $175.00 to $225.00 for commercial litigation in the Boston suburbs where rates are lower. *See* Tr. I at 231, 261. The court therefore finds that the record supports a range of $175.00 to $250.00 per hour for similar work in Boston. *See Rupert III* at *5, 2002 U.S. Claims LEXIS 294, at *20.

The court on review is mindful that petitioner carries the burden of proof. In this case the special master awarded rates of $300.00 for Mr. Conway and $250.00 for Mr. Homer. However, much of the justification for the rates was put forth by petitioner's witnesses, whose testimony rested on the presence of risk in the practice. Moreover, the special master indicated that he adjusted hours billed as part of the lodestar analysis. *See Rupert III* at *5, 2002 U.S. Claims LEXIS 294, at *20 n. 8. This court discounts the effect of these considerations in the testimony. Further, although the skill set is equivalent to plaintiff's personal injury, medical malpractice, and products liability litigation, the range must be adjusted for the fact that the witnesses, in the main, were using rates for complex commercial matters as a proxy. While the skills and complexity of issues may correspond, the rate cannot be deemed equivalent to an extrapolation of an hourly rate from a contingency fee. Finally, the rates testified to for all the legal work discussed above represent a range of skills for complex civil matters. This court has identified some skills that are not required due to unique facets of Vaccine Act work. The rates for Messrs. Conway and Homer also must account for these differences.

Taking into account the above, the prevailing rates should fall at the lower end of the range of comparables. The record supports a lodestar of $250.00 hourly rate for Mr. Conway and a rate of $210.00 for Mr. Homer.

### 5. *Paralegal rate*

Respondent argues that the special master's analysis in setting the paralegal rate is similarly infirm. It argues that the special master failed to establish a prevailing rate for paralegal fees and considered rates charged by paralegals in cases that were not comparable to Vaccine Act practice. Mr. Needham testified that paralegals in the relevant field generally are billed at between $75.00 and $95.00 an hour. *See* Tr. I at 70–71. Mr. O'Connell testified that the rate for commercial litigation paralegals in Wellesley, Massachusetts, is $85.00 per hour. *See* Tr. I at 141. Mr. Lipman testified to a range of between $60.00 and $125.00 and that he pays his own paralegals $100.00 an hour. *See* Tr. I at 218. These paralegal rates are reflective of the attorneys' practice areas.

The court finds that the special master did not abuse his discretion or otherwise commit an error of law in setting the paralegal rate. The special master's decision to set the paralegal rate at $85.00 an hour therefore stands.

### CONCLUSION

It is worth recalling the Supreme Court's admonition that "[a] request for attorney's fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437, 103 S.Ct. 1933. This case fails that exhortation.

Any precedential value of this case on the facts is limited. During oral argument, respondent's counsel advised the court that respondent's original motion for review was a test case, and that the Office of Special Masters had been holding other fee cases pending the opinion in this case. At that time counsel for respondent represented to the court:

> This is a particularly unique case .... There are cases in the program now that are being stayed pending what happens here, and so I think that what the Respondent and probably the Petitioner at least initially thought in this case was that some guidance by the Court would help to bring some sanity to the process so that we didn't have ... every single petitioner liti-

gating the fee issue in every single case .... I think that the reason we brought this case is because the petitioners chose it to be the model test case to raise the fees and to rachet it up[,] and I think the record that we've put together ... is as good as it can get really in any case based on that complexity ....

Transcript of Proceedings, *Rupert v. Sec'y of HHS*, No. 99–774V, at 35–36 (Fed.Cl. Dec.10, 2002). Counsel for petitioner made a statement to similar effect during the original hearing before the special master in August:

> MR. CONWAY: I provided our witnesses with a lot of information, including all the decisions[,] the other affidavits-I tried to prepare them to assist the Court because we knew that this decision and the decision of the [Court of Federal Claims] was going to affect, not only our fees, but the fees of other people across the country.

Tr. I at 351.

The court cautions the parties against propelling the findings and conclusions in this case beyond their competency, such that this decision on review be used as a benchmark, to be adjusted based on factors relating to the locale, for all petitioners' fee awards under the Vaccine Act. It may well be that petitioner's law firm in this case represents petitioners in many cases; and it may well be that it has been the practice for the parties to utilize a set hourly rate, *viz.*, $175.00, in order to avoid litigating rates, and that the expectation would be to project the rates set in this case on other cases; and it may well be that higher rates will burden the Vaccine Act. This court's task, however, is to set the lodestar, making adjustments when appropriate. Any precedential effect of this opinion with respect to the facts is restricted to this law firm and a discrete period of time, *e.g.*, two years. Redress for a crushing monetary burden rests with the United States Congress. If the Vaccine Act is too expensive to implement, Congress should be the first to know and is the cognizant branch of the Government to take corrective action. Accordingly,

IT IS ORDERED, as follows:

1. Pursuant to 42 U.S.C. § 300aa–12(e)(2)(C), this case is remanded to the special master to enter an award of attorneys' fees and costs for paralegals for those hours that the special master determines should be compensated.[7]

2. The award shall include petitioner's final submission of hours on this motion for review.

| Attorney | Rate |
|---|---|
| Conway | $250.00 |

| Homer | $210.00 |
| Paralegal | $ 85.00 |