Earl DIXON and Joy Dixon, Parents of Noah Matthew Dixon, Petitioners,

v.

SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 01–605V.

United States Court of Federal Claims.

Filed Under Seal: May 27, 2004.

Reissued: June 16, 2004.[1]

James E. Baker, Miracle, Pruzan, Pruzan & Baker, Seattle, Washington, for petitioners.

Catharine E. Reeves, Torts Branch, Civil Division, United States Department of Justice, for respondent.

## OPINION AND ORDER

BLOCK, Judge.

### I. Introduction

This is a case brought under the National Childhood Vaccine Injury Act (the "Act")[2]

---

1. This opinion originally was issued under seal on May 27, 2004. The court afforded the parties an opportunity to propose redactions in the opinion prior to its publication, but no such redactions were proposed. Accordingly, the opinion is herein reissued for publication, unsealed.

2. Public Health Services Act, § 2111(b)(1)(A), as amended, 42 U.S.C. §§ 300aa–1 to 34.

for review of the Special Master's denial of a claim for compensation. But at its heart, this case is about a tragedy brought about by a cruel providence and a failure of learning. The tragedy here is of the worst sort, the illness of a child—in this case a baby boy. The failure here is also of the worst sort, the inability of medicine and science to agree as to the cause of this little boy's illness. While the root of the illness may not be the result of human agency, the amelioration of this boy's condition is made all the more problematic by the failure to understand its origin. This failure of medicine and science here also means that the Special Master certainly was not arbitrary in ruling that the compensation mechanism our society established to recompense families for the ill effects of a product—a vaccine designed to prevent disease and thus normally of tremendous utility—is not available to a family that may need it most. Truly, as Alexander Pope opined, too little learning is a dangerous thing.[3]

Two-year old Noah Dixon was diagnosed as exhibiting autistic-like symptoms and only moderate cognitive and physical development for a child that age. His parents, Earl Dixon and Joy Dixon ("petitioners" or "the Dixons") subsequently filed an action for compensation under the Act, alleging that Noah's condition resulted from an encephalopathy caused by the Measles–Mumps–Rubella ("MMR") vaccine administered to him on May 14, 1999. After receiving documentary and testimonial evidence from both parties, the Special Master determined the petitioners did not meet their statutory burden of proof and denied their petition for compensation under the Act.

On December 29, 2003, petitioners filed in this court a Motion for Review of the Special Master's decision. Petitioners ask this court to reverse the Special Master's November 25, 2003 decision of non-entitlement and grant them compensation under the Act for Noah's alleged injuries. Pet'rs' Mot. for Review at 18. For the reasons stated below, the court upon review holds the Special Master met the applicable legal standard in finding petitioners did not satisfy their statutory burden of proving Noah's May 14, 1999 MMR vaccination was the cause in fact of Noah's medical condition.

## II. Background

The Special Master's opinion, *Dixon v. Sec'y of the Dept. of Health and Human Servs.*, 2003 WL 23218020 (Fed.Cl. Nov. 25, 2003), sets forth the full facts of this case. This court provides only those facts relevant to this review.

### A. Noah's Medical History.

The parties do not dispute the following facts about Noah's medical history. Noah was born on January 22, 1998 by repeat cesarean section after a pregnancy of 39 weeks. At the time of his delivery, Noah "had bruising on his ear lobes and face, and had a floppy left ear, as well as periorbital edema." *Dixon*, 2003 WL 23218020, at *2. Otherwise, he was quite healthy. His Apgar scores were 8 and 9 and he weighed just above 10 pounds. His head circumference measured 14.5 inches; his length was 21 inches, large for his gestational age. *Id.* Noah was discharged with his mother on January 25, 1998. On February 5, 1998, Noah's pediatrician, Dr. Hugh Alexander, found him to "be a well infant" and administered a hepatitis B vaccination. *Id.* Dr. Alexander also saw Noah on February 22, 1998, and again on April 6, 1998. During this April appointment, Dr. Alexander noted that Noah had seborrhea[4] and a "small prominence in the parietal region." *Id.* Dr. Alexander then administered to Noah the Diphtheria–Tetanus–acellular Pertussis (DTaP), Hib, Hep B and inactivated Polio (IPV) vaccinations. *Id.* Noah's medical records do not

---

3. "A *little Learning* is a dang'rous Thing;
   Drink deep, or taste not the *Pierian* Spring;
   There *shallow* Draughts intoxicate the Brain,
   And drinking *largely* sobers us again."
   Alexander Pope (1688–1744), from An Essay on Criticism [lines 215–218], reprinted in, Christopher Ricks, The Oxford Book of English Verse (Oxford Univ. Press 1972), at page 258.

4. Seborrhea is an excessive secretion of sebum; a semi-fluid substance composed of fat and epithelial debris secreted by the sebaceous glands. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1500 (27th ed.1988).

indicate any adverse reactions to these vaccinations.

On July 14, 1998, Dr. Alexander examined Noah again and concluded his development was normal. During this visit, Dr. Alexander noted that "[Noah] was rolling and pulling to sit, using hand transfers and vocalizing." *Id.* Noah's medical records indicate that July 14, 1998 was the last time Dr. Alexander examined Noah. *Id.* (*citing* Pet'rs' Supplemental Pet. at 99–112).

On October 4, 1998, the Dixons brought Noah to the emergency room because he was having difficulty breathing. The emergency room doctors considered Noah's symptoms consistent with an "asthma exacerbation." *Id.* The doctors also considered pneumonia or aspiration of a foreign body as possible causes of the difficulty, yet ruled out both of these after evaluating Noah's chest x-ray. Noah's symptoms subsided after treatment of an albuterol nebulizer and Prelone syrup. *Id.* The doctors finally concluded Noah suffered a bronchospasm and discharged him 90 minutes after arriving to the emergency room. *Id.*

Noah's next medical check-up occurred on January 29, 1999, when Dr. William Pollard examined him at a pediatric clinic. Dr. Pollard noted Noah "was walking, playing pat-a-cake, grasping fingers, waving bye-bye, releasing objects, and was going from sitting to standing." *Id.* Dr. Pollard again saw Noah on February 16, 1999, when he treated Noah for "reactive airway" disease. After this visit, there is no indication in Noah's medical records of any further treatment or visits to any doctor until May 14, 1999. On this date, Noah received the following vaccines: MMR, Hib, and Varicella. *Id.* Noah missed his next scheduled appointment, the so-called "18–month" appointment. His medical records contain no documents or accounts of his health for the five months following his May 14, 1999 vaccinations. *Id.*

On October 27, 1999, however, Noah visited his pediatric clinic. There, the examining physician recorded in Noah's medical record his "goopy eyes," a runny nose, and a cough. The doctor, furthermore, registered his concerns for Noah's behavior and noted "disturbing signs," such as his excessive drooling, repetitive noise-making, and grunting and reaching for objects. *Id.* at *3. The doctor found Noah's language and behavior were abnormal for his age, and diagnosed "possible URI, viral conjunctivitis, probable language delay, and … suspected other possible developmental delay." *Id.* The doctor recommended that the Dixons schedule a "well-baby" exam as soon as possible, and referred Noah to a specialist for neurodevelopmental testing and speech therapy.

Dixons took Noah to the "well-baby" exam on November 3, 1999, where he received DTaP and oral polio vaccinations. *Id.* At the time of this visit, the examining physician observed that Noah had regressed to the point where he could no longer walk or talk, that he ate wood and paper, ran stiffly, but could not walk up stairs or sit on chairs normally. *Id.* In addition, Noah, it was noted, could not verbalize two-word sentences, yet could feed himself finger foods. *Id.* Dr. Pollard's dictated notes of this visit recorded that Noah had an older sibling diagnosed with Asperger's syndrome ("high functioning autism") and that Noah's father was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"). *Id.* The doctor also observed Noah to be "in his own little world," that Noah ignored other people's emotions, made limited eye contact, and had a very high pain tolerance. *Id.* Based on his observations, the doctor diagnosed Noah with pica,[5] and possible ADHD or autism spectrum disorder. *Id.*

Thereafter, on February 2, 2000, and later on March 30, 2000, Noah underwent a series of evaluations conducted by a neurodevelopmental team. As a result of these evalua-

---

5. Pica is an eating disorder characterized by the repeated eating of non-nutritive substances over a period of one month or longer. Patients may eat non-edible objects such as paint, plaster, dirt, ice, or laundry starch. Pica generally affects small children, pregnant women, and people whose cultural environment is most compatible with the eating of non-food items. *WebMD,* http://my.webmd.com/hw/health_guide_atoz /nord214.asp?last selectedguid={5FE84E90– BC77–4056–A91C–9531713CA348}.

tions, the team diagnosed Noah with autism, moderate developmental delay, and pica. *Id.*

On October 10, 2001, petitioners filed their claim for compensation under the Act. They alleged that Noah sustained an encephalopathy[6] as a result of his May 14, 1999 MMR vaccination. Petitioners further alleged that Noah's encephalopathy "manifested itself in autistic-like features ... before June 17, 1999." Pet'rs' Mot. for Review at 2. After reviewing the evidence, the Department of Health and Human Services ("respondent") concluded that petitioners provided insufficient evidence to support their claim for a compensable injury under the Act. *Dixon,* 2003 WL 23218020, at \*1.

Consequently, on March 12, 2002, petitioners filed a Supplemental Petition. The respondent filed its report under Vaccine Rule 4(b)[7] on May 3, 2002. After the parties filed their respective medical reports and eyewitness affidavits, the Special Master convened an evidentiary hearing on March 20, 2003 to determine if petitioners presented sufficient evidence for compensation under the Act.

### B. *Petitioners' Evidence.*

Petitioners offered evidence by oral testimony or affidavit of Noah's mother and grandmother, Dr. F. Edward Yazbak, Dr. Thomas A. Schweller, Dr. Mark Geier, and Dr. Vijendra K. Singh, Ph.D. In both written and oral testimony, Mrs. Dixon claimed she first developed concerns about Noah's development after his May 14, 1999 vaccinations. *Id.* at 4 (*citing* Pet'rs' 2d Sworn Statement of Parents Tr. at 12–17). Mrs. Dixon stated that on the morning of May 15, 1999, she found Noah "crying with severe projectile vomiting followed by a lengthy period of severe diarrhea" for the next 10 days. *Id.* (*citing* Pet'rs' 2d Sworn Statement of Parents Tr. at 9). Petitioners argue this sudden

change in Noah's behavior provided the first indication that Noah suffered an encephalopathy. *See* Pet'rs' Mot. for Review at 15–16.

Ms. Uldine M. James is Noah's maternal grandmother. Ms. James worked for 15 years as an early childhood educator and kindergarten teacher. Sworn Statement of Uldine M. James at 1, ¶ 1. On June 17, 1999, Mrs. Dixon and Noah visited Ms. James at her home. Prior to this visit, Ms. James saw Noah on numerous occasions and noticed nothing unusual about either his behavior or physical development. *Id.* at 2, ¶ 5. On this visit, approximately one month after his MMR, Ms. James observed Noah and found him very fussy and feverish with projectile vomiting. *Id.* at 2, ¶ 8. She also noted that Noah "was not himself and was not the same baby." *Id.* In August 1999, Ms. James visited Mrs. Dixon and Noah for a three-day visit. *Id.* at 2, ¶ 9. During this visit, Noah did not talk, would scream in frustration, and throw himself on the floor. *Id.* Noah also ate and chewed paper and wood, and would jump off of anything. *Id.* Both Ms. James and Mrs. Dixon "had to watch him constantly so that he would not injure himself." *Id.*

Dr. Yazbak is a board-certified pediatrician and the author of various published articles regarding autism. Dr. Yazbak's admitted area of concentration is the alleged connection between the MMR vaccine and autism. His research indicates the MMR vaccine can cause autism "on occasion" because "sufficient evidence exists to support the likelihood of an association between the MMR vaccine and autism." *Id.* at \*5. Although his expertise centers on the alleged connection between the MMR vaccine and autism, Dr. Yazbak testified that Noah more likely than not suffered an encephalopathy. *Id.* at \*6. Dr. Yazbak concluded the antigens contained in the May 14, 1999 MMR vaccination more probably than not injured Noah and caused

---

**6.** The Vaccine Injury Table ("the Table") defines "encephalopathy" as "any significant acquired abnormality of, or injury to, or impairment of function of the brain." 42 U.S.C. § 300aa–14(b)(3)(A). Petitioners, using Dr. Schweller's explanation, defined "encephalopathy" as "an impairment of various parts of the brain" or "a change in some mental function ... There is a disturbance of function of the brain." Tr. of March 20, 2003 Ev. Hearing at 29–30.

**7.** Vaccine Rule 4(b) requires respondent to file a report within 90 days of the filing of the petition setting forth "a full and complete statement of respondent's position as to why an award should or should not be granted." In this report, respondent must offer a medical analysis of petitioners' claims, as well as any legal arguments in opposition to the petition. *Id.*

an ensuing neurological problem. *Id.* at *5; *see* Tr. of March 20, 2003 Ev. Hearing at 208:17–22 ("[I] am up here to say that . . . to the best of my knowledge, in my long experience with infectious diseases, that this child was damaged after the vaccination. That he was normal before. That he is damaged after.").

Dr. Schweller is a board-certified physician in pediatric neurology and electroencephalography, and specializes in child neurology. Although he is the only expert witness who physically examined Noah prior to the hearing, Dr. Schweller saw Noah when he was four years and eight months old—nearly three and one half years after the May 14, 1999 vaccination. At this examination, Dr. Schweller noted "multiple areas of brain dysfunction . . . . [i]n the language and cognitive areas and in the motor areas, suggesting that there had been damage to those areas of the central nervous system." *Id.* at *8. After ruling out alternative genetic and metabolic causes, Dr. Schweller concluded Noah could have sustained an encephalopathy. Dr. Schweller, however, expressly premised his opinion solely on Noah's medical records and his mother's recollections. As a result, Dr. Schweller could not pinpoint the onset of Noah's alleged encephalopathy.

Dr. Geier is a board-certified geneticist and deeply involved in vaccine epidemiology. He derives his vaccine expertise through studying vaccine-related medical literature, databases, articles and information on vaccine safety, and efficacy in vaccine policy. *Id.* at *9. Dr. Geier has published multiple articles, and tailored his testimony to the importance of statistical databases in finding relationships and possible links between autism and various vaccines. *Id.*

Dr. Singh is one of the country's leading experts on vaccine injuries. Dr. Singh specializes in studying the incidence of MMR-related autoimmune disorders in autistic children. On June 4, 2002, Dr. Singh analyzed Noah's serum, which tested positive for Myelin Basic Protein (MBP) Antibody and MMR Antibody. Pet'rs' Reply at 14. Dr. Singh concluded:

> This subject is positive for autoantibodies to myelin basic protein, which is an indica-

tor of autoimmunity to myelin structure in the brain. This reaction most probably was caused by an atypical measles infection by MMR vaccination as revealed by elevated level of measles antibodies and an inappropriate antibody reaction to MMR vaccine.

*Id.*

### C. *Respondent's Evidence.*

Respondent presented two experts, Dr. Yuvak Shafrir and Dr. Lawrence Moulton. Dr. Shafrir is a child neurologist and board-certified in neurology, pediatrics, and electroencephalopathy. He concentrates his practice on treating children with autism. *Dixon,* 2003 WL 23218020, at *7. Dr. Shafrir testified that contrary to the opinions of the petitioners' experts, Noah's condition is more symptomatic of autism than of an encephalopathy. Dr. Shafrir based his opinion not only on Noah's genetic predisposition to autism (given his brother and father's similar condition), but also on what he perceived was an absolute lack of evidence identifying a neurological reaction to the MMR. *Id.* Dr. Shafrir also argued that petitioners' experts failed to provide a credible causal relationship between Noah's MMR and the onset of his symptoms. *Id.; see* Tr. of March 20, 2003 Ev. Hearing at 277:8–11 ("[W]e have absolutely no support to time and the onset of the developmental regression before, after, or any other kind of relation to the MMR vaccine."). While he did not discount the possibility of an encephalopathy, Dr. Shafrir concluded a preponderance of the evidence points to regressive autism as the more likely cause of Noah's medical condition. *Id.* at *8 (*citing* Tr. of March 20, 2003 Ev. Hearing at 255–260).

Dr. Moulton is a professional biostatistician who works at Johns Hopkins University as an associate professor in the Department of International Health. Tr. of March 20, 2003 Ev. Hearing at 118:2–7. Dr. Moulton also has a joint appointment at the University's Department of Biostatistics. *Id.* at 118:8–9. Dr. Moulton challenged Dr. Geier's use of the Vaccine Adverse Event Reporting System ("VAERS") to draw a causal relationship between MMR and autism.

D. *The Special Master's Decision and the Petitioners' Request for Review.*

On March 20, 2003, the Special Master conducted an evidentiary hearing with the parties in accordance with Vaccine Rule 8(b). After the hearing, the Special Master considered all of the testimony and written documents both parties submitted as evidence in this case. On November 25, 2003, the Special Master issued the decision and denied petitioners' claim for compensation under the Act.

In the opinion, the Special Master correctly characterized the central issue in the case as whether the evidence presented by petitioners more likely than not proved their contention that "the MMR vaccine resulted in a vaccine-related encephalopathic event caused by one or more of the 'attenuated viruses,' weakened but still live viruses, administered to Noah on May 14, 1999." *Dixon,* 2003 WL 23218020, at *4. After reviewing the evidence proffered by both parties, the Special Master also correctly observed that the petitioners face a real dilemma in "that the signs and symptoms of encephalopathy are frequently similar to the signs and symptoms of autism." *Id.* at *5. Although recognizing that there very well might be a possible connection between MMR and an encephalopathy, the Special Master found that petitioners neither proved that administering the vaccine was the cause of Noah's condition nor established that the condition itself was an encephalopathy. *Id.* at *11.

The Special Master's determination of petitioners lack of proof of causation largely turned on Dr. Shafrir's evaluation of Noah's medical records.[8] Specifically, the Special Master found two of Dr. Shafrir's arguments persuasive. First, Dr. Shafrir found no documented evidence that Noah suffered a neurological reaction to the MMR causing an encephalopathy. *Id.* at *10. In addition to a lack of any buttressing neurological testing, Dr. Shafrir found:

> no evidence of autistic enterocolitis syndrome in Noah's injuries which, according to the Wakefield study,[9] would have suggested a causal link, considered by the medical community as a possible link between MMR and autism.

*Id.*

Dr. Shafrir likewise observed that Noah's medical records did not indicate either a presence of live measles or evidence of autistic enterocolitis syndrome. *Id.* This is important, Dr. Shafrir opined, because the absence of live measles belies petitioners' contention that Noah suffered an encephalopathy. "We do not have the [Wakefield] syndrome to fit MMR encephalopathy or any relationship to the MMR." *Id.* (*citing* Tr. of March 20, 2003 Ev. Hearing at 260:15–16) (internal quotation marks omitted).

Persuaded that Noah's condition was not an encephalopathy, the Special Master believed the likely cause of Noah's condition was "the presence of unexpected onset of early regressive autism," but was constrained in so finding "by the basis upon which [p]etitioners made their claim, which is that an encephalopathy, not autism, is the alleged injury sustained by Noah as a result of the MMR vaccine he received." *Id.* at *11. In any event, the Special Master gave an additional reason why petitioners' causation contention failed—petitioners were unable to provide sufficient evidence that the onset of Noah's condition occurred within a medically

---

8. As noted by the Special Master: "Contemporaneous medical records are not supportive of [p]etitioner's claim and, as observed by Dr. Shafrir for [r]espondent, the contemporaneous medical records present the evaluations of at least four developmental specialists, whose main business in life is to find out what actually happened to this child, and what was the source of his developmental problem; none of the specialists supported the notion of encephalopathy." *Dixon,* 2003 WL 23218020, at *11.

9. Dr. Yazbak, Dr. Geier, and Dr. Shafrir referenced the Wakefield study in providing their expert opinions to the court. The Wakefield study posits an association between MMR, severe gastrointestinal disorders, and autistic-like syndromes. The association arises from a study of biopsies from autistic children who also had a live measles vaccine strain in their intestines. Current research on this association also documents incidents of the measles vaccine in cerebral spinal fluid. *See generally* Wakefield et al., *Enterocolitis in Children with Developmental Disorders,* 95 AMERICAN J. OF GASTROENTEROLOGY, 2285–95 (Sept.2000).

appropriate time frame. To the Special Master, this temporal difficulty was bolstered by Dr. Shafrir's testimony relating to the lack of proximity in time between the administering of the vaccine and the onset of Noah's symptoms because the "[p]resence of an encephalopathy could not be considered likely without verification of a temporal relationship in this case . . . ." *Id.* at *12.

In conclusion, finding Dr. Shafrir's evaluation of Noah's medical records "most persuasive," the Special Master listed the following reasons for denying petitioners' claim:

(1) petitioners did not provide sufficient evidence of symptoms of, or support for, an encephalopathy;

(2) the parents' imprecise and "vague" recollections about Noah's medical history and the timing of their first concerns about his development; and

(3) Noah's symptoms also appear approximately the same time or age that "one may expect to begin seeing evidence of autism."

*Id.*

On December 29, 2003, petitioners filed a "Motion for Review and Objections" in this court pursuant to Vaccine Rules 23 and 24.

### III. Discussion

#### A. *The Vaccine Act.*

Exactly how to apply the Vaccine Act is the focus of our case. This Act provides for a system of compensating individuals who claim to have been injured by certain vaccines. The Act essentially shortcuts the burden of proving causation a petitioner would normally face in standard tort litigation. Instead of proving causation, the Vaccine Act provides a burden-shifting device known as the "Vaccine Injury Table." 42 U.S.C. §§ 300aa–14(a). If a case is "on-Table," then the Table provides a presumption that the vaccine caused the injuries if the petitioner establishes the onset or "significant aggravation" of predicate injuries occurred within a time period set by the Table. 42 U.S.C. §§ 300aa–11(c)(1)(C)(I); *Bunting v. Sec'y of the Dept. of Health and Human Servs.*, 931 F.2d 867, 872 (Fed.Cir.1991).

Hope of recovery is not lost, however, if the injury or condition does not appear on the Table or if the symptoms do not appear within the listed time frames. A petitioner may then show the vaccination in question constitutes the cause-in-fact of the injury. 42 U.S.C. § 300aa–11(c)(1)(C)(ii)(I) and (II). This is a difficult evidentiary burden because the petitioner must prove by a preponderance of the evidence that the vaccine, and not some other agent, was the *actual* cause of the injury. *Munn v. Sec'y of the Dept. of Health and Human Servs.*, 970 F.2d 863, 865 (Fed.Cir.1992) ("Given the vagaries of human illnesses particularly in young children, that is not always an easy burden to carry.").

Actual causation here is tantamount to the traditional tort standard of legal causation-in-fact. *See Shyface v. Sec'y of Health and Human Servs.*, 165 F.3d 1344, 1352 (Fed.Cir. 1999) ("an action is the legal cause of harm if that action is a 'substantial factor' in bringing about the harm, and the harm would not have occurred but for the action."). A petitioner must, therefore, offer a "medical theory causally connecting the vaccination and the injury." *Id.* (*citing Grant v. Sec'y of the Dept. of Health and Human Servs.*, 956 F.2d 1144, 1148 (Fed.Cir.1992)). A persuasive medical theory, moreover, is the product of a "logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Id.; Hines v. Sec'y of the Dept. of Health and Human Servs.*, 940 F.2d 1518, 1525 (Fed.Cir.1991). Finally, a reputable medical opinion or scientific explanation must support this logical sequence of cause and effect. *Grant*, 956 F.2d at 1148; 42 U.S.C. § 300aa–13(a)(1) ("The special master or court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion.").

A petitioner will not succeed, however, solely on the basis of its preponderant evidence demonstrating causation-in-fact. Once a petitioner meets its burden, the Act shifts the burden to the government to show that no alternate cause exists for a claimant's injuries. 42 U.S.C. § 300aa–13(a)(1).[10] The

10. 42 U.S.C. § 300aa–13(a)(1) states in pertinent part:

burden, however, does not even shift unless the Special Master concludes the petitioner carried its burden. It is the combination of these two provisions, not the operation of just one, that gives rise to an award of compensation. *See Grant,* 956 F.2d at 1149 ("The Vaccine Act expressly separates the inquiry for alternative etiologies from the inquiry for causation. These are two separate inquiries under the statute.").

### B. *Jurisdiction and Standard of Review.*

Our statutory inquiry, however, does not end with identifying the parties' respective burdens of proof under the Act. The Act's standard of review is also highly significant because this court must give great deference to the findings and conclusions of the Special Master pursuant to the Act under familiar principles of administrative law.

Specifically, section 12(e)(1) of the Act establishes this court's jurisdiction to review decisions of a Special Master upon a properly filed motion for review. 42 U.S.C. § 300aa–12(e)(1); *see also* Vaccine Rule 23; *Phillips v. Sec'y of the Department of Health and Human Servs.,* 988 F.2d 111, 112 (Fed.Cir. 1993). This court may embark on one of three courses of action when reviewing a special master's decision in a vaccine case. *Rupert v. Sec'y of Dept. of Health and Human Servs.,* 55 Fed.Cl. 293, 297 (2003). This court may:

(A) uphold the findings of fact and conclusions of law of the Special Master and sustain the Special Master's decision,

(B) set aside any findings of fact or conclusion of law of the Special Master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the Special Master for further action in accordance with the court's direction.

(1) Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole–
  (A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title *and*

42 U.S.C. § 300aa–12(e)(2)(A)–(C); *see also* Vaccine Rules 27, 36(b).

This court, moreover, should apply a different standard depending on what aspect of the Special Master's decision is under review.

These standards vary in application as well as in degree of deference. Each standard applies to a different aspect of the judgment. Fact findings are reviewed by [the Federal Circuit], as by the Claims Court judge, under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard.

*Saunders v. Sec'y of Dept. of Health and Human Servs.,* 25 F.3d 1031, 1034 (Fed.Cir. 1994) (*quoting Munn,* 970 F.2d at 870 n. 10).

■ The practical effect of this structure is to give the Special Master's determinations decisional effect, and to place this court in the role of a reviewing court. *Munn,* 970 F.2d at 869. Under the Act, this court reviews the Special Master's factual findings according to the "arbitrary and capricious" standard. 42 U.S.C. § 300aa–12(e)(2)(B); *Saunders,* 25 F.3d at 1033; *Munn,* 970 F.2d at 870 n. 10 (Fed.Cir.1992).

The court's inquiry in this regard must therefore focus on whether the Special Master examined the "relevant data" and articulated a "satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (*quoting Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) (internal quotation marks omitted)); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) ("Arbitrary and capricious" determination involves a "consideration of the relevant factors and whether there has been a clear error of judgment.").

(B) that there is *not* a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.
(Emphasis added).

The scope of review under this standard is highly deferential and precludes this court from substituting its own judgment for that of the Special Master. *See Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43, 103 S.Ct. 2856 (*citing SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *Bowman Transp. Inc. v. Arkansas–Best Freight System*, 419 U.S., at 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (*per curiam*)) ("The reviewing court should not attempt itself to make up for such deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.' We will however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' "); *Hines v. Sec'y of the Dept. of Health and Human Servs.*, 940 F.2d 1518, 1527 (Fed.Cir.1991) ("If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate."). The Act, furthermore, makes clear that this court "is not to second guess the Special Masters [sic] fact-intensive conclusions; the standard of review is uniquely deferential for what is essentially a judicial process." *Hodges v. Sec'y of the Dept. of Health and Human Servs.*, 9 F.3d 958, 961 (Fed.Cir.1993). Indeed, "[t]his is a standard well understood to be the most deferential possible." *Munn*, 970 F.2d at 870.

### C. Review of the Special Master's Decision Denying Petitioners' Claim.

■ Applying these statutory standards to this case, it is clear that the Special Master's decision was in accordance with law. In reaching this decision, it is helpful to recite exactly why petitioners thought otherwise.

Petitioners' first argument is rooted in their contention that the Special Master overlyrelied on Dr. Shafrir's often contradictory testimony[11] and ignored the importance of their witnesses and other proffered evidence. For instance, petitioners assert the Special Master's treatment of Dr. Yazbak's presentation amounts to nothing more than "lip service" and demonstrates a fundamental misunderstanding of his testimony. Pet'rs' Reply at 9–10. Petitioners further contend the Special Master wrongly concluded that Dr. Schweller could not determine the date of Noah's injury even though he opined that Noah's problems began within weeks of his vaccination. *Id.* at 11.

In addressing Dr. Geier's testimony, petitioners maintain the Special Master "totally ignored the testimony of Dr. Geier to the effect that Noah sustained an encephalopathy from his MMR vaccine," Pet'rs' Reply at 13, and thus did not "address directly the core issue in this case, *i.e.*, the presence or absence of an encephalopathy," *Dixon*, 2003 WL 23218020, at *9. Finally, petitioners claim the Special Master gave no credence to Dr. Singh and "totally ignored evidence that Noah had an autoimmune disorder related to his MMR vaccine."[12] Pet'rs' Reply at 14.

The court notes that petitioners' contentions concerning the Special Master's determinations of evidentiary weight and value of expert testimony involve questions of fact. As a result, the court must review the Spe-

---

11. For example, petitioners contend the Special Master impermissibly ignored evidence contrary to Dr. Shafrir's opinion, including the following so-called "unchallenged facts in the record," which petitioners characterize as "substantial evidence:"

(1) the petitioners' photographs of Noah before and after his May 14, 1999 MMR vaccination; and

(2) Mrs. Dixon's May 4, 2002 sworn statement, later verified by Ms. Uldine, in which she declares, "Noah's dramatic change in condition began before the period of June 17 to June 21, 1999."

Pet'rs' Mot. for Review at 15–16.

In sum, petitioners argue that because Dr. Shafrir arbitrarily discounted the above in arriving at his opinion, the Special Master, correspondingly, acted arbitrarily in relying on Dr. Shafrir in finding "no credible date as to onset of injury." *Id.*

12. Petitioners suggest a possible reason the Special Master did not place much weight, if any, on Dr. Singh's testimony was Dr. Shafrir's comments that Dr. Singh's medical data teetered "on the verge of fraud," that he did not "behave like a scientist," and his work amounted to "breaking the law." Pet'rs' Reply at 15 (*citing* Tr. of March 20, 2003 Ev. Hearing at 293:15; 294:14; 297:15–16).

cial Master's factual determinations according to the deferential arbitrary and capricious standard. *Saunders,* 25 F.3d at 1034. Indeed, the Act affords particular freedom to the Special Master to consider and weigh evidence as a part of the ultimate determination of whether to award compensation. 42 U.S.C. § 300aa–13(b);[13] *see also Phillips v. Sec'y of the Dept. of Health and Human Servs.,* 988 F.2d 111, 112 (Fed.Cir.1993) ("The special master serves as the trial forum, takes the evidence, considers the arguments of the petitioner and the Government, and decides whether the evidence establishes that a compensable injury occurred.").

The Special Master's decision as to causation ultimately rests on a want of hard documentary evidence presented by petitioners, as well as the lack of reliability of the testimony of two key witnesses. There is more than enough evidence in the record to support the Special Master's conclusion that petitioners' experts—Dr. Yazbak and Dr. Schweller—in essence offered opinions based on nothing more than speculation or educated guesses. The Special Master rightly characterized their opinions as to causation as predicated upon "after the fact" information. *Dixon,* 2003 WL 23218020, at *11. Dr. Yazbak premised his opinion solely on his review of Noah's medical records and, based on those records, did not advance any scientific theory as to whether brain injury was a cause of the condition. Dr. Schweller, on the other hand, did testify that Noah more likely than not suffered an encephalopathy. *Id.* at 8 (*citing* Tr. of March 20, 2003 Ev. Hearing at 34–35, 37:12–13). The Special Master, however, discounted the testimony because Dr. Schweller could not develop an accurate temporal association with the May 14, 1999 MMR because of Mrs. Dixon's unclear narratives. *Id.* This conclusion is not bereft of rationality. *See Grant,* 956 F.2d at 1148; 42 U.S.C. § 300aa–13(a)(1) ("The special master or court may not make such a finding based on the claims of a petitioner alone, unsub-

stantiated by medical records or by medical opinion.").

Furthermore, the Special Master's finding that Dr. Shafrir's opinion was credible also had a rational basis in fact. While Dr. Shafrir conceded that Noah *may* have suffered an encephalopathy, he qualified this conclusion by stressing its uncertainty because of the utter lack of neurological testing in Noah's records. There exists nothing to the contrary to refute the Special Master's finding of great credibility here. *See Cucuras v. Sec'y of the Dept. of Health and Human Servs.,* 993 F.2d 1525, 1528 (Fed.Cir.1993) (*citing United States v. United States Gypsum Co.,* 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746 (1948)) ("Moreover the Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight.").

Most importantly, it was appropriate for the Special Master to discount in part Dr. Geier and Dr. Singh's testimony. The problem facing the Special Master was that Dr. Geier and Dr. Singh's testimony on the alleged connection between MMR and autism provides a wealth of knowledge on a subject wholly unrelated to the petitioners' causation claim—whether the vaccination was the cause of Noah's alleged encephalopathy. By focusing on the narrow question of causation, the Special Master logically placed little weight on these expert opinions. Determining credibility lies inherently within the Special Master's province as the trier of fact, to whom we must grant the highest deference. *Munn,* 970 F.2d at 871; *Hines,* 940 F.2d at 1527 ("Such arguments as to the weighing of evidence ... do not demonstrate reversible error.").

In conclusion, the court rejects petitioners' first argument concerning the inappropriate weight given the evidence by the Special Master. The court finds the Special Master's findings and analysis are neither arbitrary nor capricious, and thus "virtually un-

---

13. Section 13(b) reads in pertinent part:
    Any such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court. In evaluating the weight to be afforded to any such diagnosis, conclusion, judgment, test result, report, or summary, the special master or court shall consider the entire record and the course of the injury, disability, illness, or condition until the date of the judgment of the special master or court.

challengeable on appeal." *Lampe v. Sec'y of Dept. of Health and Human Servs.*, 219 F.3d 1357, 1362 (Fed.Cir.2000). Petitioner simply failed to meet its difficult burden of proving by a preponderance of the evidence that the vaccine, and not some other agent, was the " 'substantial factor' in bringing about the harm, and the harm would not have occurred but for the action." *Shyface,* 165 F.3d at 1352.

▮ Petitioners' second argument is that the Special Master committed legal error by suggesting the petitioners' burden of proof in this case required identifying an "exact date" of the onset of Noah's symptoms. Pet'rs' Reply at 17, para. IV(A). In support of their contention, petitioners point specifically to the Special Master's discussion of their inability "to prove that [the] onset occurred within a medically appropriate time frame," *Dixon,* 2003 WL 23218020, at *11, and to the conclusion that "[n]either parent could provide evidence of the specific timing of changing conditions." *Id.* at *12.[14]

Petitioners contend the Special Master's conclusion and reasoning indicate a fundamental misunderstanding of the statutory burden of proof in this case. Petitioners argue the testimonies of Mrs. Dixon, Ms. Uldine, Dr. Schweller, and Dr. Yazbak, combined with Dr. Geier's statistical analysis of the possible adverse effects of MMR, prove by a preponderance of the evidence that the onset of Noah's alleged encephalopathy occurred sometime between May 14, 1999 and June 17, 1999. *See* Pet'rs' Reply at 9–17. Petitioners contend that their burden of proof was not "medical certainty," as the Special Master seemingly required, but merely a preponderance of the evidence, which the respondent did not at all rebut as required by the Act. Pet'rs' Mot. for Review at 17–18.

The issue presently before this court is whether the Special Master improperly interpreted petitioners' burden of proof to include a requirement of identifying the exact date of the onset of Noah's symptoms. Issues of statutory interpretation constitute legal questions, which this court reviews under the "not in accordance with law" standard. *Saunders,* 25 F.3d at 1034. This court, therefore, reviews the Special Master's decision *de novo* to determine whether her decision was in accordance with the Act. *Euken v. Sec'y of the Dept. of Health and Human Servs.,* 34 F.3d 1045, 1047 (Fed.Cir.1994) (*citing Whitecotton v. Sec'y of Dept. of Health and Human Servs.,* 17 F.3d 374, 376 (Fed.Cir.1994)); *Saunders,* 25 F.3d at 1033; *Rupert,* 55 Fed. Cl. at 298.

Petitioners offer an elaborate syllogism of sequential cause and effect: Noah's condition manifests itself through autism; autism might be a result of an encephalopathy; encephalopathy is a possible side-effect of MMR; Noah was outwardly normal before his MMR, yet sick after it; therefore, Noah's MMR was the proximate cause of his condition. Petitioners' causation theory, however, must involve more than a mere proximate temporal association between the vaccination and the injury. *Hodges,* 9 F.3d at 960 (Fed. Cir.1993) ("This court has said previously that a proximate temporal association alone does not suffice to show a causal link between the vaccination and the injury."); *Grant,* 956 F.2d at 1148 (*citing Hasler v. United States,* 718 F.2d 202, 205 (6th Cir. 1983), *cert. denied,* 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984) ("[T]he inoculation is not the cause of every event that occurs within the ten-day period .... Without more, this proximate temporal relationship will not support a finding of causation.")).

Paradoxically, petitioners' claim for legal error necessarily rests on the Special Master's underlying factual determinations about Noah's records and the expert witness testimony. As this court previously found, the Special Master rejected petitioners' causation contention after a thorough and careful review of the entire record in this case. This determination, moreover, falls squarely with-

---

14. Petitioners also cite the following statement of the Special Master for support of their argument: Further information about onset of symptoms to verify a temporal relationship could not be retrieved from records or from Petitioner's rec- ollections. Both Dr. Schweller and Mrs. Dixon admit that she could not identify with certainty the onset of her first concerns. *Id.* at *12.

in the Special Master's unique purview to which this court must defer. *Burns v. Sec'y of the Dept. of Health and Human Servs.*, 3 F.3d 415, 417 (Fed.Cir.1993); *Hines*, 940 F.2d at 1527. To be sure then, independent of the discussion of the temporal problem, the Special Master reached the conclusion, based on the weighing of expert opinions in this case, that petitioners did not prove by a preponderance of the evidence that Noah's condition was caused by an encephalopathy.[15]

The Special Master thus discussed the onset date issue merely as a means of *verifying* the conclusion of the absence of proof of an encephalopathy. *Dixon*, 2003 WL 23218020, at *12. The Special Master explicitly acknowledged that temporal associations, while probative, are not by themselves sufficient to establish causation. *Id.* at *11. In other words, the Special Master did not decide this case *solely* on petitioners' inability to demonstrate a medically acceptable period of onset.

Furthermore, the court takes issue with the unstated underlying premise of petitioners' second argument, that the vaccination was the necessary cause of Noah's alleged brain injury. Although the Special Master conceded Noah's MMR *could* be the cause of his vomiting and diarrhea, this is a long way from attributing the vaccine to an undiagnosed brain injury. The evidence in the record merely suggested that Noah *may* have suffered some after-effects of the MMR, but also that his records documented no concrete evidence of a brain injury. In light of this uncertainty, one can understand the context of the temporal discussion here and why the Special Master believed it necessary for petitioners to establish a "medically appropriate" time frame to verify their fledgling claim of causation. In the absence of medical evidence of a specific onset of injury, petitioners' argument amounts to nothing more than a *post hoc ergo propter hoc* assertion. Surely, petitioners are wrong that this is enough to fulfill their statutory burden of proof. *See Fricano v. United States*, 22 Cl.Ct. 796, 800 (1991) (*"post hoc ergo propter hoc*

... is regarded as neither good logic nor good law").

Accordingly, the Special Master's endeavor for a more accurate date of onset does not equate to a new and more stringent statutory requirement of temporal causation or altogether change petitioners' burden of proof. This court finds no legal error in the Special Master's analysis. The Special Master diligently attempted to find some acceptable factual support in Noah's records when petitioners' claim for causation was not supported by a preponderance of the evidence.

## IV. Conclusion

For the foregoing reasons, the court AFFIRMS the Special Master's decision. The court, accordingly, dismisses the petition with prejudice.

**IT IS SO ORDERED.**

---

**15.** "The evidence presented by Respondent is more persuasive that Noah's symptoms, more likely than not, were manifestations of autism with no proven link to the vaccine. The court agrees that there is simply no convincing evidence *and* no reliable evidence of a temporal relationship." *Dixon*, 2003 WL 23218020, at *11 (emphasis added).